IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

| | |
|---|---|
| CRAIG R. CHINCHILLA, ) <br> ) <br> Plaintiff, ) <br> ) <br> ) <br> vs. ) <br> ) <br> ) <br> SPX CORPORATION, a Delaware ) <br> corporation, ) <br> ) <br> Defendant. ) | No. 05 C 0814 <br> Magistrate Judge Schenkier |

### MEMORANDUM OPINION AND ORDER

The defendant, SPX Corporation, brings a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), the three-count complaint of plaintiff, Craig R. Chinchilla. For the reasons set forth below, defendant's motion to dismiss (doc. # 6) is granted as to Counts I and III, but denied as to Count II. However, as to Count II, the Court *sua sponte* raises the question of its subject matter jurisdiction over this remaining claim, which on its face fails to meet the $75,000.00 jurisdictional prerequisite imposed by 28 U.S.C. § 1332(a).[1]

I.

The plaintiff's complaint alleges three claims: breach of contract (Count I); unjust enrichment (Count II); and violations of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* (Count III), based on his contention that he is owed additional compensation relating to his employment with defendant. The facts alleged, which we take as true for purposes of this motion, are as follows.

---

[1] By the parties' consent, on August 31, 2005, this case was transferred to this Court for all purposes, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) (doc. ## 16-18).

SPX is engaged in the business of selling laboratory analyzers, including new systems, parts, and service to businesses (*Id.*, ¶ 6). From July 2002 until January 31, 2004, plaintiff was the North America Sales Manager for SPX and was based in SPX's remote office in DuPage County, Illinois (Compl., ¶ 7). In 2002, defendant switched plaintiff from a salary plus commissions compensation structure to a salary plus annual incentive award compensation structure (*Id.*, at ¶ 8). Because plaintiff's claims are structured with respect to the 2002 and 2003 Incentive Award Plans, we will address the facts related to each Plan separately.

### A.

The 2002 Plan provided that incentive pay would be awarded if plaintiff exceeded the identified order volume and/or gross sales margin goals. If plaintiff exceeded both goals, he would also receive a "Hit Both Goals" incentive award (Compl., at ¶ 9 and Ex. 1).

The terms "sales" and "order volume" in the 2002 Plan includes orders for service, parts, and new systems and modules (Compl., ¶ 11). Further, the term "Incentive Award Formula" in paragraph E of the 2002 Plan states: "A participant may earn incentive compensation on order and margin dollars achieved above the target" (Compl., ¶ 12). Paragraph E(1) of the 2002 Plan also states: "the incentive award is based on actual order and sales margin dollar performance for all business above targeted Performance" (Compl., ¶ 12). The 2002 Plan states that the Vice President of Sales and Service has "the authority to interpret the Plan, as he/she deems necessary for proper administration of the Plan" (Compl., Ex. 1, ¶ C). The 2002 Plan further states that "[a]ny determination of the Vice President of Sales and Service with respect to this Incentive Plan shall be final and binding upon all participants" (*Id.*).

Paragraph E refers to an attachment to the 2002 Plan, which states: "See Year 2002 Regional Sales Manager Incentive Program (template)" (Compl., ¶ 12 and Ex. 1). The attached "template" contains two documents.

The first document is the 2002 Incentive Plan individualized for Mr. Chinchilla, identifying his specific "order volume" and "sales margin" targets. That document includes a chart showing the percentage incentive awards that plaintiff could earn by making 100 percent of his targets and how much more he could earn by exceeding his targets by different increments up to 30 percent (Compl., Ex. 1). The chart stops with "130% To Plan" (meaning, exceeding the targets by up to 30 percent). The chart provides no percentage formula for calculating awards for order volume or sales margins exceeding the target by more than 30 percent.

The second attached document demonstrates how the Incentive Plan formula works, using hypothetical figures for target and actual order volumes and sales margins (Compl., Ex. 1). As with plaintiff's personalized plan, the chart in the second attachment also stops with calculations of "130% To Plan."

On or about the last week of February 2003, plaintiff received an incentive award check under the 2002 Plan in the amount of $50,400 (an amount reflecting performance by a plaintiff of "130% to Plan") (Compl., ¶ 16). Plaintiff claims that the award check did not adequately compensate him for his sales activity in 2002. Specifically, plaintiff claims that because he had sales in excess of 130 percent of his target, an award check stopping at the 130 percent level did not fully compensate him for the amount he was due under the 2002 Plan (Compl., ¶¶ 15-17). Plaintiff alleges that when he challenged the amount of this 2002 incentive award check, defendant advised him that the 2002 Plan "capped incentive awards at 130% 'of Plan'" (Compl., ¶ 18). Plaintiff asserts that he

3

did not know that the 2002 Plan capped incentive awards at 130 percent (Compl., ¶ 19). For his performance in 2002, plaintiff seeks to recover an amount totaling at least $39,600.00 (in addition to the amount he has already received) (Compl., ¶¶ 25, 28).

### B.

In or about March or April 2003, SPX allegedly presented plaintiff with a 2003 Incentive Award Plan (Compl., ¶ 20 and Ex. 2). The 2003 Plan, like the 2002 Plan, provided for incentive awards beyond plaintiff's salary if he exceeded his target numbers, namely the identified order volume goals and gross sales margin goals. The 2003 Plan is structurally similar to the 2002 Plan. Like the 2002 Plan, the 2003 Plan gave the plaintiff specific "targets" and then outlined the "percentage earned" (*i.e.*, bonus or award) he would receive if he met his targets on "order volume," or "sales margin," or both ("Hit Both Goals") or exceeded them by up to 30 percent. Also like the 2002 Plan, the 2003 Plan stops providing percentage numbers for bonus amounts if plaintiff achieved more than 130 percent of his targets, and does not indicate any "percentage earned" for performance that exceeded 130 percent of the targets. The 2003 Plan, like the 2002 Plan, states that any determination by SPX with respect to the 2003 Plan "shall be final and binding upon any or all participants" (Compl., Ex. 2, ¶ C).

Unlike the 2002 Plan, the 2003 Plan expressly provided a limit on bonuses in Paragraph E(3): "no additional incentive amounts will be awarded for performance that exceeds 130 percent of a participant's Order Volume or Gross Margin targets" (*Id.*, ¶ 21 and Ex. 2, ¶ E(3)). In addition, unlike the 2002 Plan, the 2003 Plan expressly states that "[a] bonus shall be payable under this arrangement if the Company determines, in its sole discretion, that a participant is entitled to one" (Compl., Ex. 2, ¶ A).

4

Plaintiff alleges that the 2003 Plan did not create an "enforceable contract" (Compl., ¶ 35). And, indeed, the 2003 Plan states on its face that it "does not create a contractual relationship or any contractually enforceable right for participants" (Compl., Ex. 2, ¶ A). However, plaintiff alleges that under an unjust enrichment theory, he is entitled to $40,788 in commissions for the revenue he generated during his employment in 2003 (*Id.*, ¶ 37).

## II.

The purpose of a motion to dismiss under Fed.R.Civ.P.12(b)(6) is to test the sufficiency of the complaint, *Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001), not to decide the case on the merits. *See Triad Assocs.,Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). When ruling on a motion to dismiss, a court accepts all well-pleaded facts as true, and all reasonable inferences are drawn in favor of the plaintiff. *See, e.g., Sprint Spectrum L.P. v. City of Carmel, Ind.*, 361 F.3d 998, 1001 (7th Cir. 2004). The allegations of a complaint should not be dismissed for a failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cody v. Harris*, 409 F.3d 853, 857 (7th Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The complaint need only convey enough information that the defendant is able to understand the gravamen of the complaint. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir. 1999). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims . . ." *Schever v. Rhodes*, 416 U.S. 232, 236 (1974); Rule 12(b)(6) should be employed only when the complaint does not present a legal claim." *Johnson v. Revenue Mgmt. Corp.*, 169 F.3d 1057, 1059 (7th Cir. 1999).

Pursuant to Fed.R.Civ.P. 10(c), "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Under this rule, materials attached to the complaint may be considered without converting a motion to dismiss under Rule 12(b)(6) to a summary judgment motion. *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). The Seventh Circuit has commented that Rule 10(c) is "a narrow exception" to the rule barring consideration of extrinsic materials on a motion to dismiss, which is "aimed at cases interpreting, for example, a contract." *Id.* Thus, exhibits attached to a complaint may be considered part of the complaint "if they are referred to in the plaintiff's complaint and are *central* to his claim." *Id.* (emphasis in original) (quoting *Wright v. Assoc. Ins. Co., Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)).

Here, the 2002 and 2003 Plans are attached to the complaint, are referred to and quoted in the complaint, and indeed are central to plaintiff's theories of liabilities. Accordingly, we may – and do – consider these materials on defendant's motion to dismiss, without converting the motion to one for summary judgment.

### III.

Application of the motion to dismiss standards to the alleged facts results in dismissal of Count I for failure to state a claim. Count I alleges a breach of contract. Under Illinois law, contract interpretation is a question of law. *Cromeens, Hollman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003) (citing *Bowers Mfg. Co. v. Chicago Mach. Tool Co.*, 453 N.E.2d 61, 66 (Ill.App. 1983)). This interpretation is governed by the "four corners" rule, which requires a court to determine if any of the language within the contract is ambiguous by looking to its plain, ordinary meaning, and to examine the contract "as a whole, giving effect, to the extent possible, to all contract provisions." *Bourke v. Dun & Broadstreet Corp.*, 159 F.3d 1032, 1036-37 (7th Cir. 1998). This rule

also requires a court to confine its analysis to the contract terms when those terms are unambiguous. *Id.*, at 1036-37.

The terms of a contract are considered ambiguous if the language of the contract is fairly or reasonably susceptible of more than one meaning. *Bourke*, 159 F.3d at 1036. The mere fact that, in hindsight, parties disagree about the terms of the contract do not render it ambiguous. *Kaplan v. Shure Bros.*, 266 F.3d 598, 605 (7th Cir. 2001). Moreover, the fact that a contract does not expressly address a certain point will not inexorably lead to a finding of ambiguity. *See Kempner Mobile v. Southwestern Bell*, 02 C 5403, 2003 WL 22595263, *6, n. 9 (N.D. Ill., Nov. 7, 2003).

In seeking to dismiss Count I, defendant makes two arguments. *First*, defendant argues that the language of the 2002 Plan, taken as a whole, is unambiguous (Def.'s Mem. at 6). Defendant contends that the "template referred to and attached to the 2002 Plan" which sets forth plaintiff's "specific performance goals and incentive plan," sets forth "the incentive compensation [p]laintiff could earn, based on the amount he exceeded over the established target, up to 130%" (Def.'s Mem. at 6) (emphasis in original). Defendant argues that the fact the template stops at 130 percent, and provides no percentages for amounts that plaintiff could earn for performance that exceeded 130 percent of the target, makes it "plain that the incentive award is only for all business above targeted performance up to 130% percent" (Def.'s Mem. at 7) (emphasis in original). Defendant argues that had it intended to compensate plaintiff for performance exceeding the 130 percent threshold, then it would have included percentages above 130 percent in the "% Earned" chart (Def.'s Mem. at 7).

*Second*, defendant argues that the 2002 Plan gives SPX discretion to interpret the Plan (Def.'s Mem. at 8). Thus, defendant argues that "to the extent any ambiguity did exist, the 2002 Incentive

7

Plan explicitly vests SPX with authority to interpret the Plan," with its determination final and binding (*Id.*).

Plaintiff does not address this latter argument. Rather, plaintiff's lead argument is that the language of the 2002 Plan does not need to be interpreted because it is unambiguous; and, that it unambiguously "states that Plaintiff would be paid for all sales" (Pl.'s Resp. at 4) (emphasis in original). In the alternative, plaintiff argues that assuming, *arguendo*, that the 2002 Plan language is ambiguous, then (1) "it must be construed against defendant" as the drafter, because the 2002 Plan is silent on the issue of a cap; and, (2) because the contract language in the 2002 Plan is ambiguous, extrinsic evidence must be admitted to show that defendant's intent in 2002 was different than in 2003, when the 2003 Plan was written to expressly include a cap at 130 percent (Pl.'s Resp. at 5).

To analyze these arguments for purposes of the motion, we accept – as do the parties – that the 2002 Plan is, in fact, a contract. We therefore proceed to the question of whether the 2002 Plan is ambiguous as to the existence of a cap. In our view, the 2002 Plan, read as a whole, leads to the conclusion that there was a cap on incentive awards at 130 percent of the target goals.

The language of the 2002 Plan stops at 130 percent when it gives percentage amounts for plaintiff's individualized proposed incentive award, and the example/illustration in the 2002 Plan also stops at that number (Compl., Ex. 1). As defendant correctly observes, "the Plan does not provide a formula (and none can be approximated from the chart) for determining how much a participant who exceeded 130% of the established target would even receive it" (Def.'s Mem. at 8). Thus, while the 2002 Plan does not contain an express statement that incentive awards will be capped, as does the 2003 Plan, we conclude that this silence does not create an ambiguity concerning the existence of a cap, in light of the overall language and structure of the 2002 Plan.

8

We have considered plaintiff's argument that defendant's intent to provide incentive awards for performance exceeding 130 percent of target performance can be found in the language stating that "[t]he incentive award is based on actual order and sales margin dollar performance for *all* business above targeted performance." (Compl., Ex. 2, ¶ E(1)) (emphasis added). However, we must read that language not in isolation, but together with the entire contract as a whole. *Bourke*, 159 F.3d at 1036-37. And plaintiff's reliance on this general language collides with the actual formulas contained in the 2002 Plan used to calculate incentive awards, and the examples provided in the 2002 Plan showing how that calculation would be done. Upon what formula would plaintiff base an incentive award under the 2002 Plan for performance that exceeded 130 percent of the targets? To construe the 2002 Plan language as plaintiff would have us do here would require the Court to add additional terms to the 2002 Plan to calculate an incentive award for performance that exceeded 130 percent of target. That, of course, we cannot do under well-established principles of the law. *Fix v. Quantum Indus. Partners, LDC*, 374 F.3d 549, 553 (7th Cir. 2004) (citing *In re Marriage of Sweders*, 695 N.E.2d 526, 529 (Ill. App. 1998)).

Count I fails to state a claim upon which relief can be given. We therefore grant defendant's motion as to Count I.[2]

---

[2] Even assuming that the 2002 Plan was ambiguous about the issue of a cap on incentive awards, we note that express language in the 2002 Plan gave defendant the sole authority to interpret the Plan: "[a]ny determination of the Vice President of Sales and Service with respect to this incentive Plan shall be final and binding upon all participants" (Compl., Ex. 1, ¶ C). There is no ambiguity about that clause. The 2002 Plan language cannot be plainer in giving defendant the sole authority to "interpret" the 2002 Plan in a final and binding way. Defendant's right to do so is part of the contractual bargain between the parties with respect to the 2002 Plan, and part of the bargain to which plaintiff is thus bound.

Of course, in Illinois, all parties to a contract have a duty of good faith and fair dealing in the performance of their contractual obligations. *Batteast Constr. Co. v. Public Bldg. Comm'n*, 195 F.Supp.2d 1045, 1051 (N.D. Ill. 2001). Thus, if a defendant were to interpret a contract in a completely arbitrary way, there might be a breach. *Id.* But, here, if the 2002 Plan was viewed as ambiguous on the issue of a cap, for the reasons stated above we conclude that the interpretation of a 130 percent cap for incentive awards would be a reasonable one.

# IV.

In Count II, plaintiff claims that he is entitled to relief under an "unjust enrichment" theory. This theory embraces several concepts, including the legal notions of quasi-contract and *quantum meruit*. The relationship between these concepts was explained in *Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732 (7th Cir. 1990).

> Under Illinois law, one may become obligated to another by quasi-contract. Derived from civil law, quasi-contract is "'an obligation similar in character to that of a contract, but which arises not from an agreement of parties but from some relation between them.'" *Board of Highway Comm'rs v. City of Bloomington*, 97 N.E. 280, 284 (1911) (quoting texts on Roman and civil law). "[T]he obligation arises not from consent . . . but from the law or natural equity"; . . . it "exists from an implication of law that arises from the facts and circumstances independent of agreement or presumed intention." *Id. See also Century 21 Castles by King, Ltd. v. First Nat'l Bank of Western Springs*, 524 N.E.2d 1222, 1225 (1988); *Arthur Rubloff & Co. v. Drovers Nat'l Bank of Chicago*, 400 N.E.2d 614, 620 (1980). Because it exists by implication of law, and because the obligation imposed by it superficially resembles the obligation imposed by contract, the concept of quasi-contract has often been denoted as "contract implied in law." *See, e.g., Board of Highway Comm'rs*, 97 N.E. at 284. Nevertheless, the concept has nothing to do with "contract" as such. *Mueller v. City of Highland Park*, 519 N.E.2d 712, 715 (1988). . . .
>
> A claim in quasi-contract is established when "the defendant has unjustly retained a benefit to the plaintiff's detriment, and . . . defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, 545 N.E.2d 672, 679 (1989). *Accord Overseas Dev. DISC Corp. v. Sangamo Const. Co.*, 840 F.2d 1319, 1325 (7th Cir. 1988); *Lirtzman v. Fuqua Indus., Inc.*, 677 F.2d 548, 553 (7th Cir. 1982); *Bloomgarden v. Coyer*, 479 F.2d 201, 211 (D.C.Cir. 1973). [citation omitted]. Obviously, equitable principles play a major role in quasi-contract (although the action is one at law). The key principle is that of unjust enrichment. *City of Marshall v. City of Casey*, 532 N.E.2d 1121, 1123 (1989) (other citations omitted). Quasi-contractual duties arise only in situations of unjust enrichment, situations where "one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it and which *ex cequo et bono* belongs to another." *Bd. of Highway Comm'rs*, 97 N.E. at 285. [other citations omitted]. If that situation exists, quasi-contract mandates the imposition of an obligation upon the benefit receiver to avoid the unjust enrichment. *See Lirtzman*, 677 F.2d at 553. The obligation imposed is an obligation to pay money to the benefit

> provider, an obligation "closely akin to a duty to make restitution." *Bloomgarden*, 479 F.2d at 210. *See also Lirtzman*, 677 F.2d at 553.

*Id.* at 736-737.

*Quantum meruit* is a subset of unjust enrichment, and arises when a plaintiff alleges performance of valuable services without compensation. The unjust enrichment allegations in this case fit under the *quantum meruit* rubric. "To be successful on a quantum meruit theory under Illinois law, [a plaintiff] must prove (1) performance of services, (2) the reasonable value of the services, and (3) the receipt by the defendant from the plaintiff of a benefit which it would be unjust to retain without paying compensation." *Fischer v. First Chicago Capital Markets, Inc.*, 195 F.3d 279, 284-85 (7th Cir. 1999) (citing Illinois cases). Neither unjust enrichment nor *quantum meruit* obtains where there is a specific contract between the parties. *See People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992) (holding that unjust enrichment does not apply when there is a specific contract); *Installco Inc. v. Whiting Corp.*, 784 N.E.2d 312, 318 (Ill.App. 2002) (holding that *quantum meruit* does not apply when there is a specific contract).

Defendant's motion to dismiss Count II argues that plaintiff cannot recover because he "could not have [any] reasonable expectation that he was entitled to any award under the 2003 Incentive Plan" unless he signed the agreement, which he did not do (Def.'s Mem. at 9). Defendant argues that plaintiff's failure to agree to the terms of the 2003 Plan reflects a lack of reasonable expectation to be compensated by the Plan, and defeats the unjust enrichment claim. More particularly, defendant argues that plaintiff cannot reasonably expect to be compensated for three reasons: (1) he failed to satisfy a "condition precedent" to recovery, namely the failure to allege that he signed the 2003 Plan (an unsigned copy was attached to plaintiff's complaint), even though the Plan had a place for a

11

signature to acknowledge understanding and agreement of the Plan's terms; (2) the unambiguous language of the 2003 Plan states that defendant "does not constitute a guarantee that any bonus, incentive or compensation shall be paid," and defendant has "sole discretion" to determine if a participant is entitled to a bonus; and (3) Paragraph C of the 2003 Plan (like the 2002 Plan) provided that SPX had sole authority to "administer and interpret the Plan," and "[a]ny determination by the Company with respect to the Plan" would be "final and binding upon any or all participants" (Def.'s Mem. at 11-12).

We may quickly dispense with defendant's argument based on plaintiff's failure to sign "the agreement." The 2002 Plan on its face states that it is not a contract. We therefore fail to see how plaintiff's signature on the 2002 Plan was a "condition precedent" to his claim. Moreover, as indicated by the cases discussed above, there can be no recovery under a theory of unjust enrichment, *quantum meruit* and/or quasi-contract when there is a contract between the parties that governs rights and obligations; the premise of an unjust enrichment claim is that there is no contract between the parties; rather, obligations arise by "law or natural equity." *See Midcoast Aviation*, 907 F.2d at 736. Here, plaintiff has clearly pled a theory of unjust enrichment in Count II, and not a contract claim. Thus, defendant's argument based on a lack of signature fails.

As for defendant's other arguments, we also find them insufficient to warrant dismissal. The plaintiff has alleged in Count II the necessary elements for unjust enrichment *quantum meruit*: (1) that plaintiff performed services (Compl., ¶¶ 30-32); (2) the reasonable value of those services (Compl., Count II, prayer for relief); and (3) that it would be unjust for defendant to retain the benefit of plaintiff's service without compensating him (Compl., ¶ 37).

As we read it, defendant's arguments seek to attack this third element: specifically, that it is not unjust for defendant to retain the benefits conferred by plaintiff because plaintiff could not reasonably have expected an award in light of the distinction afforded to the Company by the 2003 Plan in deciding whether to pay any incentive award. Thus, the question raised by defendant's motion to dismiss and its brief in support is whether, as a matter of law, this Court can find it was not unjust to fail to pay plaintiff any award for sales services benefitting defendant that exceeded the targets outlined for him by SPX in the Plan.

"We cannot say as a matter of law that it is, nor can we say the opposite." *Midcoast Aviation*, 907 F.2d at 738. The language of the 2003 Plan itself is, of course, relevant to the defense of SPX to the claim. But other facts yet to be presented may bear on plaintiff's claim, and we are not prepared to say that the language of the 2003 Plan cited by defendant would trump all other facts. Consequently, we deny defendant's motion to dismiss Count II for failure to state a claim.

### C.

In Count III, plaintiff alleges a violation of the Illinois Wage Payment and Collection Act, 820 ILCS 225/1 ("Wage Act"). In that claim, plaintiff seeks to recover the sum total of the payments he alleged as unpaid commissions in Counts I ($39,600) and II ($40,788) under the 2002 and 2003 Plans. Because the Court has found that the unambiguous language of the 2003 Plan does not permit plaintiff to recover under a breach of contract theory, as a matter of law, we consider Count III only as to the sums allegedly owed under Count II, pursuant to the 2003 Plan.

The Wage Act defines wages as "any compensation owed an employee by an employer pursuant to an *employment contract or agreement* between the [two] parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2 (emphasis

13

added). Moreover, "[p]ayments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed to the employee by the employer pursuant to an *employment contract or agreement* between the 2 parties." *Id.* (emphasis added).

The defendant argues that plaintiff cannot recover under the Wage Act for any amounts allegedly due under the 2003 Plan, because the 2003 Plan was not an "employment contract or agreement" between the parties (Def.'s Mem. at 14). Thus, any monetary recovery under Count II could not be considered "wages" or "final compensation" under the Wage Act. *See Byker v. Sequent Computer Servs.*, 1997 WL 639045, at * 7 (N.D. Ill. Oct. 1, 1997) ("the absence of a contractual right" to compensation disposes of plaintiff's Wage Act claim).

Plaintiff's only response is to cite to *Camillo v. Wal-Mart Stores*, 582 N.E.2d 729 (Ill. App. 1991), to argue that when an employer promises to pay an employee a bonus based on services rendered, then the employee has a "right to receive the compensation the employer promised" (Pl.'s Resp. at 9). We find *Camillo* to be inapposite. In *Camillo*, the Court addressed the enforceability of a contractual provision that provided assistant managers with earned bonuses, but required that they be employed on the last day of the fiscal year to collect them. *Id.* at 622. The Court found that this latter limitation was unenforceable, excised it from the contract, and then found the employer obligated to pay the earned bonus on a pro rata basis under the Wage Act. *Id.* at 619-20. Here, by contrast, plaintiff admits that the 2003 Plan was not an enforceable contract (Compl. ¶ 35), as he must in order to pursue his unjust enrichment/*quantum meruit* claim. Without an alleged

14

employment contract or other agreement, plaintiff's Wage Act claim fails. Therefore, defendant's motion to dismiss Count III for failure to state a claim with respect to the 2003 Plan is granted.[3]

## IV.

Last, we address the issue of the Court's jurisdiction. The plaintiff's complaint is based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332. With all three claims in play, plaintiff satisfied the jurisdictional prerequisite for the Court's "original jurisdiction" because the parties are citizens of different states, and "the matter in controversy exceed[ed] the sum or value of $75,000, exclusive of interest and costs." *Id.*, § 1332(a). However, given the Court's rulings on the defendant's Rule 12(b)(6) motion, only Court II survives. As pled, Count II only alleges a "matter in controversy" of only $40,788.00 (exclusive of the alleged interest and costs).

Thus, it appears that Count II cannot satisfy the amount-in-controversy requirement under 28 U.S.C. § 1332. *See Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 125 S.Ct. 2611, 2616-17 (2005). The Court is required to "police the boundaries of . . . [its] own jurisdiction." *Bush v. Roadway Express, Inc.*, 152 F. Supp. 2d 1123, 1125 (S.D. Ind. 2001) (citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977) and *Tylka v. Gerber Prods. Co.*, 211 F.3d 445, 448 (7th Cir. 2000)). In line with that responsibility, we give plaintiff leave to come forward with competent

---

[3] As an alternative basis for its decision, the *Camillo* court found that the defendant could not deny plaintiff payment for an earned bonus under the doctrine of promissory estoppel. We question whether an obligation established by estoppel is an employment contract or agreement within the meaning of the Wage Act, as obligations implied by law have "nothing to do with 'contract' as such." *Midcoast Aviation*, 907 F.2d at 736-37 (citing *Miller v. City of Highland Park*, 519 N.E.2d 712, 715 (Ill. App. 1988).

In any event, plaintiff here has not alleged promissory estoppel – and, given the 2003 Plan's language, could not do so. As *Camillo* noted, promissory estoppel requires, first and foremost, a promise. 582 N.E.2d at 734. The disclaimers in the 2003 Plan show that no promise was made – which does not bar a *quantum meruit* claim, but is fatal to a promissory estoppel claim.

proof that the amount in controversy is satisfied. Failure to do so will result in dismissal of Count II without prejudice.

## CONCLUSION

For the reasons set forth above, the Court grants the defendant's motion to dismiss (doc. # 6) as to Count I and III for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Leave is given to plaintiff to bring forward competent proof that he satisfies the jurisdictional prerequisites of 28 U.S.C. § 1332(a). Plaintiff shall submit any such proof by October 11, 2005. If plaintiff does so, the defendant may respond to this proof by October 18, 2005. Failure to satisfy 28 U.S.C. § 1332(a) will result in dismissal, without prejudice, of Count II.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: September 27, 2005